**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JULY 30, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 30, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HECTOR MARTINEZ and JOLAYNE HOUTZ, husband and wife, individually and as Co-Personal Representatives of the ESTATE OF SAMUEL H. MARTINEZ, | ) ) ) ) ) | No. 104108-0<br><br>En Banc<br><br>Filed: <u>July 30, 2026</u> |
| Respondents, | ) ) | |
| v. | ) ) | |
| WASHINGTON STATE UNIVERSITY, a subdivision of the State of Washington, | ) ) ) | |
| Petitioner, | ) ) ) | |
| ALPHA TAU OMEGA FRATERNITY, INC., an Indiana Corporation; GAMMA CHI CHAPTER OF ALPHA TAU OMEGA FRATERNITY, an association; RICHMOND PROPERTY GROUP, LTD., an Indiana Corporation; LUKE HAWKSFORD, an individual; ANDREW MISCHKE, an individual; WESLEY OSWALD, an individual; COLE SOREANO, an individual; JORDAN JAMESON, an individual; and JOHN DOES 1-10, individuals, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Other Parties. | ) ) ) | |

MUNGIA, J.—On November 12, 2019, Sam Martinez, age 19, a Washington State University (WSU) freshman, died. He died from acute alcohol intoxication during a fraternity event involving hazing.

The issue raised in this appeal is whether WSU had a special relationship with Gamma Chi, establishing a duty to protect Sam Martinez from foreseeable harm caused by the fraternity. This necessarily involves the question of whether WSU had a duty to take reasonable steps to ensure that fraternities in general, and Gamma Chi in particular, adhered to rules that WSU imposed on fraternities to prevent this type of accident from happening.

The trial court ruled that WSU did not owe any duty to Sam. The Court of Appeals reversed, holding that WSU did owe Sam a duty of care because of its special relationship with Gamma Chi. We agree with the Court of Appeals.

I

FRATERNITIES BENEFIT WHEN THE UNIVERSITY RECOGNIZES THEM. IN RETURN FOR THOSE BENEFITS, THE UNIVERSITY ENTERS INTO AGREEMENTS WITH FRATERNITIES REQUIRING THEM TO ENGAGE IN, OR REFRAIN FROM, CERTAIN CONDUCT

The "Greek system"[1] and WSU could have stayed completely separate. Greek houses are not on university property at WSU. Greek chapters, such as Gamma Chi here, are chartered by their national parent organizations and must abide by national rules. If fraternities remained separate from the university, WSU would not have control over fraternities and instead student activities at fraternity houses and fraternity functions would be free of university control.

---

[1] The "Greek system" is a term for the fraternity and sorority clubs and houses of a college.

But that is not the case.

WSU and the Greek system have concluded that they both benefit by entering into a relationship. A fraternity, when it enters into an agreement with the university, receives the benefit of university recognition. University recognition brings a host of benefits to the fraternity. One benefit is that the fraternity is allowed to use the WSU name and trademark in its marketing materials. Another major benefit to the fraternity is that the university supplies them with a list of the names of incoming freshmen and their contact information. In addition to those two benefits, fraternities receive

- Access to philanthropy funds,

- University advisement services,

- Inclusion in WSU marketing materials,

- The ability to have Greek council participation in university-sponsored events, and

- Administrative support.

In addition to providing fraternities with institutional support, the university, through the Center for Fraternities and Sororities Life (CFSL), actively promotes Greek life to new and prospective students and their families. The university promotes the benefits of Greek life at orientations and shares the names of its recognized fraternities. The university provides fraternities with contact information of interested prospective students to assist fraternities with their recruitment efforts. WSU provides maps of "Greek Row" housing to students as part of its Greek life marketing.

Another benefit to fraternities is also a benefit to the university: housing first-year students. First-year students are generally required to live on campus. However, the university does not have enough housing to meet the needs of first-year students. To help meet that need, a fraternity can also house first-year students if it agrees to adhere to the university's terms. University requirements include the fraternity entering into a "University Approved Housing Standards Agreement" (Approved Housing Agreement). The Approved Housing Agreement requires the fraternity to employ a live-in advisor or house director. The fraternity house must be an alcohol and drug free location. WSU continually reviews the fraternity's Approved Housing Agreement status to ensure that the fraternity is complying with university rules. WSU investigates all reported Approved Housing Agreement violations and determines the appropriate sanction for any violation. In contrast to the other agreements between WSU and recognized fraternities, the Approved Housing Agreement does not apply to a fraternity's "live-out" house, where fraternity members may live but is not the university-approved chapter house.

In exchange for these benefits, the fraternities relinquish some of their autonomy and agree to university requirements and oversight. These requirements include having a risk management policy, an emergency/crisis protocol, and following WSU's numerous policies. In addition, fraternities are expected to work with an assigned professional from the CFSL, provide the CFSL with administrative information, and communicate with the CFSL at least monthly. The CFSL also has "the ability to consider additional support to all recognized fraternities and sororities." Clerk's Papers (CP) at 160 (boldface omitted).

Pertinent to this appeal, the university imposes rules on fraternities regarding alcohol use for activities on nonuniversity property. The university imposes additional restrictions on fraternities beyond what is required by law. These restrictions and requirements include the following:

- All fraternities and sororities which house freshmen must be alcohol-free.

  . . . .

- Alcohol consumption is prohibited entirely during ANY social event on chapter property. All social events on chapter property must be alcohol free.

- Alcohol consumption on chapter property, if permitted at all, . . . is restricted to the private rooms of students 21 years of age and older.

- All off-property social functions where alcohol is present requires a third-party vendor to serve alcohol, provide security, and verify legal age.

CP at 174.

In addition to the above restrictions, WSU prohibits fraternities, in no uncertain terms, from allowing minors to consume alcohol at any of their functions, regardless of where that function takes place:

> It is a violation of this Agreement for minors to consume alcohol on Chapter property or at Chapter functions, regardless of the function's location.

CP at 160.

WSU also prohibits fraternities from engaging in hazing:

> No . . . student organization at Washington State University may conspire to engage in hazing or participate in hazing of another.

> . . . .

> Hazing activities may include . . . [a]buse of alcohol during new member activities.

CP at 167. The no-hazing prohibition is not limited to certain locations but instead applies regardless of location. *Id*.

WSU actively works with fraternities to ensure they comply with the alcohol and hazing prohibitions and holds them accountable for violations.

The "Relationship Agreement for Residential Fraternities & Sororities" (Relationship Agreement), which fraternities must enter into for university recognition, emphasizes that WSU holds both the organizations and their members accountable for abiding by the university's rules of conduct:

> Washington State University has always emphasized the importance of individual responsibility and accountability in the lives of its students. Additionally, the rights and duties of recognized student organizations also carry with them an obligation on the part of their members, collectively, to uphold the Washington State University Standards of Conduct for Students.
>
> This statement of group accountability acknowledges that unacceptable behaviors by individuals functioning as members or officers of a student organization may have consequences for those individuals as well as for the organization. *Also, the privilege of being an officer of a student organization carries with it particular responsibility for the reasonable anticipation and prevention of foreseeable violations of University policies, resulting from either deliberate or negligent behavior of the organization's members or guests.*
>
> In general, a recognized student organization may be held accountable for the behavior of its members and guests on its premises, at events sponsored (or co-sponsored) by the organization, or when a group including significant numbers of members or guests violates University policies. Organizations that violate University policies and Standards of Conduct are subject to sanctions.

CP at 166.

Indeed, WSU put the fraternities on notice that the university would sanction them for violating the rules that applied to them as a recognized organization:

> Recognized or registered student organizations that violate university policies and the standards of conduct are subject to sanctions. A recognized or registered student organization may be held accountable for the behavior of its officers, members, or guests when the university demonstrates that:
>
> - (a) The organization or its officers should have foreseen that behavior constituting a violation was likely to occur, yet failed to take reasonable precautions against such behavior . . . .

*Id.*

If a fraternity violates any of the university rules, then the university has the authority to impose an array of sanctions, including (1) issuing written warnings, (2) issuing reprimands, (3) requiring educational programming, (4) placing the fraternity on probation, or (5) temporarily suspending the fraternity's university recognition. In addition, the university has the authority to impose more severe sanctions, including (1) levying monetary fines, (2) withdrawing freshman housing privileges, and (3) permanently withdrawing WSU recognition.

After Sam's death, WSU did exercise its control over Gamma Chi. On November 15, 2019, the university issued a "Notice of Interim Loss of Recognition" to Gamma Chi. On May 18, 2020, WSU executed a "Signed Conduct Resolution Agreement" that ended its recognition of Gamma Chi and Alpha Tau Omega (ATO National), the national fraternity Gamma Chi belonged to, through May 15, 2026.

II

WSU WAS AWARE FOR YEARS BEFORE SAM'S DEATH THAT FRATERNITIES PUT THEIR MEMBERS AND POTENTIAL MEMBERS AT RISK BY ALLOWING THEM TO DRINK ALCOHOL AND BY ENGAGING IN HAZING

WSU has known for years that fraternities in general, and Gamma Chi in particular, have engaged in alcohol misuse and hazing that have put their members and potential members at risk.

A.  <u>WSU Has Recognized that Fraternity Members Are at High Risk of Harm Because of Fraternity Practices Regarding Alcohol Misuse and Hazing</u>

In 2012, WSU convened a "Presidential Task Force on Alcohol Education and Prevention" "in the wake of several recent incidents involving alcohol-related harm to WSU students, and in acknowledgement that student alcohol/other drug use and misuse is a critical issue facing colleges and universities nationally, including WSU."  CP at 1152. Task force members were appointed based on their knowledge, leadership in the WSU community, and "ability to control and direct resources toward targeting alcohol and drug related concerns."  CP at 1153.  Members included several fraternity advisors and directors among WSU's administration.  The task force's findings included the following:

> [F]reshmen are our most vulnerable population with regard to experiencing alcohol related harm. . . .
>
> . . . [S]tudents in the Greek community, including freshman, are at significantly higher risk for binge drinking and other alcohol/other drug related harm. . . .  According to data provided by the Center for Fraternity and Sorority Life, 18 out of 18 Greek chapters had received some type of sanction for an alcohol violation over the past year.  PRH [Pullman Regional Hospital] data from the past year indicate that about 1/3 of students presenting to the PRH ED [emergency department] last year for alcohol related incidents were Greek affiliated; this number is

> disproportionately high relative to the percentage of Greek affiliated students within the overall WSU Pullman student population.
>
> . . . These types of problems are particularly associated with Greek men . . . . [M]any . . . serious alcohol related incidents recently, including several serious and high profile falls and a near-fatal recent alcohol poisoning, have been associated with Greek affiliated students.

CP at 1161.

In addition, in 2013 the CFSL highlighted the need for increased enforcement efforts to address underage alcohol use on Greek Row and the College Hill area, where chapter houses and live-out houses are located. The CFSL recommended that WSU engage in more robust accountability and education efforts with fraternity chapters to avoid alcohol misuse. Overall, WSU has recognized Greek life as a "high risk group and culture" for underage students and has continuously worked to address alcohol and hazing issues. CP at 1140.

B. Gamma Chi Has a History of Alcohol Misuse and Hazing

WSU was aware of ongoing alcohol-, drug-, and hazing-related problems associated with Gamma Chi.

For instance, in 2013, WSU's University Conduct Board sanctioned Gamma Chi with loss of chapter recognition until at least spring 2014 for a hazing incident involving alcohol. However, the University Conduct Board allowed Gamma Chi to petition to regain recognition in December 2013 and be put on a two-year probation. WSU's president ultimately modified the sanction to probation through the end of the year, provided that Gamma Chi complied with certain "remedial and instructive measures." CP at 1417. Gamma Chi was required to meet with a CFSL staff member twice a

9

semester, complete additional educational programming from the CFSL, and provide the CFSL with monthly written reports summarizing new member activities and certifying they were alcohol free.

WSU continued to address alcohol and hazing-related concerns with Gamma Chi in the following years. In 2017, a parent reported her first-year son was "'forced . . . to drink large quantities of alcohol'" and forced to "'withstand various forms of aggressive hazing'" as part of Gamma Chi's new member initiation. CP at 824. Like the CFSL had done with Gamma Chi before, it collaborated with ATO National to address the concerns, and ATO National took steps to assist WSU and the Gamma Chi chapter in the process. That same year, WSU's interim assistant vice-president for student affairs and dean of students also notified the CFSL about the need to proactively communicate with ATO National about concerns over Gamma Chi's rising alcohol-related incidents. WSU administration met with Gamma Chi students and alumni to discuss WSU's concerns.

C. Gamma Chi Had a History of Alcohol Misuse at Its Live-Out House

Gamma Chi's fraternity chapter house is not located on university property. Gamma Chi does not own the house or the real property on which the house sits. Instead, Gamma Chi rents the house from Richmond Property Group Ltd., a nonprofit corporation that is a wholly owned subsidiary of ATO National. The fraternity chapter house is subject to WSU's Approved Housing Agreement.

Gamma Chi's chapter house is located off campus on Greek Row with WSU's other fraternity and sorority chapter houses. Across the street from Gamma Chi's chapter

10

house was its live-out, "Delta Chi " or "D Chi." CP at 1335, 1337. Gamma Chi shared the Delta Chi live-out with the Sigma Nu fraternity.

WSU knew that all fraternities had live-outs in addition to their university-approved chapter houses. The chapter housing was not big enough to house the full membership of the fraternities. Although live-outs were not subject to Approved Housing Agreements, WSU recognized them as part of its jurisdiction in dealing with the safety and well-being of its students. Indeed, a majority of the CFSL's Greek life investigations were for behavior that occurred at locations other than chapter houses.

WSU addressed multiple allegations of alcohol consumption and hazing related to the Delta Chi live-out. In 2018, WSU investigated two separate incidents of student intoxication on campus. In each unrelated incident, the students admitted they were drinking at the Delta Chi live-out beforehand. In 2019, WSU received several other incident reports relating to alcohol use at Gamma Chi and Sigma Nu's shared live-out.

WSU's response to a Sigma Nu hazing incident at Delta Chi shows how it exercised its control to address alcohol and hazing-related harms at the live-outs. WSU learned from a parent that Sigma Nu was hazing pledges with alcohol at Delta Chi. In response, WSU sanctioned Sigma Nu with an interim loss of Sigma Nu's recognition. The loss of recognition meant that WSU withheld Sigma Nu's university services, privileges, administrative approval, university affiliation, access to the CFSL, and Approved Housing Agreement status. WSU later amended Sigma Nu's sanction to a

yearlong probation on holding "new member activities" and on hosting or attending "any social events involving alcohol."  CP at 1756-57.

As a condition of reinstatement following the hazing incident, Sigma Nu entered into a "Conduct Resolution Agreement" with WSU's Center for Community Standards board.  One condition was that any member who wished to remain involved in the chapter had to meet individually with the national fraternity's staff and alumni board and sign a new affirmation agreement.  In addition, all members were required to participate in a risk reduction program, alcohol misuse prevention program, and hazing prevention program.  The chapter also had to create risk management and future candidate development plans.  WSU required Sigma Nu to periodically meet throughout the probationary period to review Sigma Nu's progress.  WSU's response to Sigma Nu's hazing incident is one example of how WSU controlled fraternity conduct, including misconduct at the live-outs.

Around this same period, Gamma Chi's student president contacted WSU to express his concerns about first-year students continuing to attend parties at the live-out. The CFSL encouraged implementing restrictions to keep first-year students out of the live-out.  However, chapter-related parties continued to be held at the live-out, where first-year and underage students consumed alcohol.  Students would usually return to the Gamma Chi chapter house after the live-out parties and continue drinking.  WSU did no more to address the known concerns at that point.

III
SAM MARTINEZ CHOOSES TO ATTEND WSU

In spring of 2019, Sam Martinez and his parents visited WSU for prospective student orientation weekend. At the orientation, Sam[2] and other prospective students attended a session put on by WSU staff on the benefits of joining WSU's Greek community. That summer, members of Gamma Chi began reaching out to recruit Sam and his friends to join the fraternity. Sam and his parents returned to WSU to attend a new student orientation later that summer. While there, they attended another presentation put on by WSU staff about the benefits of Greek membership, explaining how first-years could get involved and live in Greek housing. WSU had marketing materials advertising the individual fraternities, including ATO National, and offered more information on its website.

WSU did not provide information to Sam's parents about Gamma Chi's history of allowing underage drinking and hazing its members. Hector Martinez, Sam's father, testified that if he had known about Gamma Chi's violations, he would not have allowed Sam to pledge to that fraternity. Mr. Martinez and Sam's mother, Jolayne Houtz, paid most of the fees to ATO National that allowed Sam to pledge to Gamma Chi.

Ms. Houtz, Sam's mother, testified to the following:

17.     As Sam got more serious about his decision to pledge Gamma Chi, I looked for information about the Greek System at WSU generally and at Gamma Chi specifically.

---

[2] We refer to Sam Martinez by "Sam" because this is how his parents, parties in this case, refer to him. We intend no disrespect but instead mean to respect the family's wishes.

18.     I searched the WSU website for details about what Greek life was like at WSU (which I believe was the WSU "Go Greek" website).

19.     I did not find information about Gamma Chi's disciplinary history on the Go Greek website.

20.     I also attended orientation events at WSU, including at least one session on Greek life.

21.     At orientation, WSU gave us written information about Greek organizations.

22.     This information promoted them as places where students could make friends, learn leadership skills and participate in community service.

23.     WSU did not share information it had about what we later learned was a culture of excessive alcohol consumption and hazing prevalent in the WSU Greek system.

24.     On the contrary, the written, online, and verbal information that WSU provided to us painted a rosy picture of leadership development, academic support, comradery, social engagement, and community service.

25.     None of the information that WSU provided disclosed Gamma Chi's troubled history on the WSU campus, including that WSU had received numerous reports of underage drinking and incidents of hazing, and that a membership review by national fraternity leaders the year before Sam was recruited resulted in nearly half of the Gamma Chi members being kicked out of the fraternity.

CP at 851-52.

Sam pledged to join WSU's Gamma Chi chapter the summer before he started at WSU. Sam began his college career by living on campus in a dorm. CP at 1976. While Sam was a first-year, WSU posted flyers on campus explaining the process for students planning to move into a Greek chapter house. Sam expressed interest in moving into Gamma Chi's chapter house within his first semester.

14

Also during Sam's first semester, Gamma Chi held their annual "Big-Little" night where underclassmen are put into their "Greek family." CP at 1994. This was an initiation process for incoming members, or "pledges," to the chapter. On the evening of November 11, 2019, Sam and the other pledges were called to clean Gamma Chi's live-out as a ruse for the Big-Little event. Once there, they were paired with their upperclassmen "big brothers." Pledges were expected to share an alcoholic drink that their "big brother" brought for their "family." CP at 1572-73. That evening, Sam drank at the live-out with the other Gamma Chi members as part of the Big-Little ritual. Within about an hour, the members moved from the live-out to Gamma Chi's chapter house, where they continued to drink. Sam showed signs of heavy intoxication at the chapter house. He passed away from acute alcohol intoxication early in the morning.

Following Sam's death, WSU issued an interim loss of recognition of Gamma Chi. WSU, after conducting an investigation and making findings, terminated Gamma Chi's recognition through May 2026. ATO National later revoked its charter of Gamma Chi at WSU due to the events at the Big-Little night leading to Sam's death.

IV

SAM MARTINEZ'S ESTATE BROUGHT SUIT. THE TRIAL COURT ENTERED SUMMARY JUDGMENT IN FAVOR OF WSU. THE COURT OF APPEALS REVERSED

Ms. Houtz and Mr. Martinez, Sam's parents, brought a wrongful death suit individually and as personal representatives of their son's estate (Estate), against WSU. They argued that WSU's negligence contributed to Sam's death. WSU moved for summary judgment, arguing it did not owe any duty of care to Sam. The Estate

responded, identifying several sources of duty, including (1) a special duty arising from Washington's hazing statutes, RCW 28B.10.900-.908, (2) an affirmative duty flowing from WSU's acts and omissions under *Restatement (Second) of Torts* § 302B (A.L.I. 1965), and (3) duties arising out of WSU's special relationships under *Restatement (Second) of Torts* §§ 40 and 315(a) and (b). The trial court granted WSU's motion for summary judgment, concluding that WSU did not owe any of these duties. The Estate appealed.

Division One of the Court of Appeals stayed the case pending our decision in *Barlow v. State*, 2 Wn.3d 583, 540 P.3d 783 (2024). In *Barlow*, we held that a university did not owe a duty to protect a student from another student's sexual assault under *Restatement (Second) of Torts* § 315(a) or (b). *Id.* at 592-97. Instead, the majority held in that context that a university's duty to its students is "based on a student's enrollment and presence on campus or participation in university controlled activities." *Id.* at 598.

After lifting the stay, the Court of Appeals distinguished this case from *Barlow*, holding that a special relationship between a university and its recognized fraternities is different from the relationship between a university and individual students. *Martinez v. Wash. State Univ.*, 33 Wn. App. 2d 431, 472-73, 562 P.3d 802 (2025). The court held that the special relationship between WSU and Gamma Chi gave rise to WSU's duty to protect Sam from foreseeable harm under *Restatement (Second) of Torts* § 315(a). *Id.* Accordingly, the Court of Appeals reversed the trial court's order granting summary

judgment for WSU. *Id.* at 473. However, the court held that WSU did not owe Sam a duty under the Estate's other negligence theories. *Id.* at 459, 464-65.

WSU sought review in this court of whether its relationship with Gamma Chi gave rise to a duty under § 315(a).[3] WSU argues that the Court of Appeals' decision contradicts our holding in *Barlow* and that WSU did not exercise sufficient control over Gamma Chi to impose a duty on it. In contrast, the Estate argues that the Court of Appeals correctly distinguished *Barlow* because the relationship between a university and a recognized fraternity is different from that between a school and individual students. In addition, the Estate argues that WSU had sufficient control over Gamma Chi to give rise to a § 315(a) duty.

We agree that WSU owed a duty to protect Sam from foreseeable harm, flowing from its special relationship with Gamma Chi. Accordingly, we reverse the trial court's summary judgment order and remand for proceedings consistent with this opinion.

V

WSU HAD A SPECIAL RELATIONSHIP WITH GAMMA CHI, GIVING RISE TO ITS DUTY
UNDER *RESTATEMENT (SECOND) OF TORTS* § 315(a)

Summary judgment is a determination that trial would be useless—that there is no genuine issue of any material fact, so that the moving party is entitled to judgment as a matter of law. *Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 284, 493 P.3d 117 (2021). We review orders granting summary judgment de novo. *Id.*

---

[3] The parties did not raise the other theories of duty. Accordingly, we do not address them. *Dalton M, LLC v. N. Cascade Tr. Servs., Inc.*, 2 Wn.3d 36, 50-51, 534 P.3d 339 (2023).

In a negligence case, a plaintiff must show that the defendant owed a duty to the

plaintiff. *Id.* Whether a duty exists is a threshold inquiry in a negligence claim and is a

question of law we review de novo. *Id.* Determining the existence of a duty involves

considerations of logic, common sense, justice, policy, and precedent. *Barlow*, 2 Wn.3d

at 589. We are guided by the principles reflected in *Restatement (Second) of Torts*. *Id.*

Actors generally do not have a duty to prevent harm to others. Even if an actor

could prevent the harm, they are generally not required to do so no matter how dire the

consequences. However, certain special relationships require an actor to affirmatively

protect another. *See* RESTATEMENT (SECOND) OF TORTS §§ 315-319. As is relevant here,

*Restatement (Second) of Torts* § 315 provides:

> There is no duty so to control the conduct of a third person as to prevent
> [them] from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person
> which imposes a duty upon the actor to control the third person's conduct,
> or
>
> (b) a special relation exists between the actor and the other which
> gives to the other a right to protection.

Thus, a special relationship may be based on (a) the defendant's control of a third party

or (b) the defendant's protective relationship with the victim.[4] This case only concerns

§ 315(a).

---

[4] The dissent argues that what makes a relationship "special" under § 315(a) includes one party having responsibility for, authority over, or the ability to control the other. Dissent at 9. The dissent then cites examples from *Restatement (Second) of Torts* §§ 316-319 where there is a heightened level of responsibility or control to argue there is a need for a more intimate relationship to also impose a § 315 duty. *Id.* at 9-10. However, we have held that the heightened level of responsibility or control for those other sections of the *Restatement*

Under § 315(a), a defendant owes a duty to a third party's foreseeable victims when (1) a definite, established, and continuing relationship exists between the defendant and the third party, giving rise to foreseeability, and (2) the defendant has an ability to control the third party to prevent harm to foreseeable victims. *Volk v. DeMeerleer*, 187 Wn.2d 241, 256, 386 P.3d 254 (2016); *Barlow*, 2 Wn.3d at 594. Here, both elements are met between WSU and Gamma Chi.

First, WSU had a long-standing relationship with the Gamma Chi fraternity that gave it insight into the dangers of alcohol abuse and hazing for incoming pledges like Sam. Second, not only was the harm of alcohol abuse and hazing for Gamma Chi pledges foreseeable to WSU, but the university had the ability to exercise control over the fraternity to address these dangers. Therefore, under § 315(a), WSU owed Sam a duty to take reasonable actions to prevent harm to him arising out of Gamma Chi's alcohol and hazing misconduct.

A. WSU and Gamma Chi's Long-standing Relationship Allowed WSU To Foresee Gamma Chi's Dangerousness and Potential Victims

WSU and Gamma Chi had a "definite, established, and continuing relationship" as required to form a § 315(a) special relationship. *Volk*, 187 Wn.2d at 256. WSU first

---

are not required to establish a special relationship and duty under § 315. *See, e.g.*, *Volk v. DeMeerleer*, 187 Wn.2d 241, 264-65, 386 P.3d 254 (2016) ("[T]he amount of control required to meet § 319 is not necessary to fulfill the § 315 special relationship . . . . Considering the language of the *Restatement*, it seems that its drafters contemplated that 'diverse levels of control' would 'give rise to corresponding degrees of responsibility.'" (quoting *Ests. of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St. 3d 284, 299, 1997 Ohio-194, 673 N.E.2d 1311)). Therefore, the dissent incorrectly inflates what is required to establish a special relationship under § 315, confusing this *Restatement* with others.

recognized Gamma Chi in 1911. The terms of WSU and Gamma Chi's long-standing, continuous relationship were outlined in the Relationship Agreement, which both parties voluntarily entered into on an annual basis.

WSU argues that it could not have a special relationship with Gamma Chi.

First, WSU argues it cannot have a special relationship with Gamma Chi because a fraternity is not a "person" under § 315(a). Pet. for Rev. at 22-23. However, WSU does not point to any authority limiting the special relationship under § 315(a) to relationships with individuals. We do not find any policy reason why § 315(a) should be limited to apply only to individuals. We note that § 315(b) applies to nonindividuals. *See, e.g.*, *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 929 P.2d 420 (1997); *H.B.H. v. State*, 192 Wn.2d 154, 429 P.3d 484 (2018).

Second, WSU argues that since fraternities act through individual students, *Barlow* controls and immunizes WSU from liability. We do not find this argument convincing. A university's relationship between it and its students is different from the one between it and its fraternities. In *Barlow*, a WSU student was assaulted by another WSU student at an off-campus party. In contrast to WSU's relationship with Gamma Chi, in *Barlow* we noted that WSU

1. Did not have sufficient insight into the potential dangerousness of the assaulting student,

2. Would not have been able to identify the victim as a potential victim, and

3.  Could not exercise sufficient control of the assaulting student to manifest a duty.

2 Wn.3d at 594.  Here, each of these factors exist in WSU's relationship with Gamma Chi, giving rise to a § 315(a) special relationship.  WSU

1.  Had sufficient insight into the potential dangerousness of Gamma Chi's leaders and members not only exposing underage members to excessive alcohol use but also encouraging and requiring them to engage in excessive alcohol use,

2.  Was able to identify Sam, as a fraternity member and especially as a freshman, as a potential victim, and

3.  Could exercise sufficient control of Gamma Chi to take reasonable steps to prevent foreseeable harm.

The first two factors provide the bases for concluding that WSU had the ability to foresee the harm, as is required under § 315(a).

Regarding the first factor, the nature of WSU and Gamma Chi's long-standing relationship gave WSU sufficient insight into the danger that Gamma Chi's alcohol and hazing practices posed to its members.  WSU had received numerous reports about, investigated, and discussed alcohol hazing concerns related to the fraternity on and off campus over the years.  In the months leading up to Sam's death, leadership from Gamma Chi and ATO National met with WSU to discuss concerns about alcohol and first-year students at the live-out.  Hazing and alcohol consumption among first-year fraternity students was a well-known danger to WSU.

Regarding the second factor, Sam Martinez was the type of victim WSU was aware needed protecting. Not only was WSU able to identify potential victims of alcohol abuse and fraternity hazing, but it did in fact identify the class of students who were at risk of harm. WSU had documented the heightened risk of alcohol abuse for first-year recruits to Greek life organizations, especially first-year men, years prior and had taken some action to address this danger. Sam was a foreseeable victim of the dangers posed by Gamma Chi's hazing that involved alcohol.

Unlike in *Barlow*, here, the first two factors establish that the nature of WSU and Gamma Chi's relationship gave rise to foreseeability to justify imposing a duty.

Regarding the third factor, WSU had sufficient ability to control Gamma Chi to establish a duty under § 315(a), as discussed below.

B. WSU Had Sufficient Control over Gamma Chi To Impose a Duty

For a § 315(a) duty to exist, a defendant must have "some ability to 'control' the third person's conduct." *Volk*, 187 Wn.2d at 264 (quoting *Ests. of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St. 3d 284, 298, 1997-Ohio-194, 673 N.E.2d 1311). We have noted that "'diverse levels of control'" can "'give rise to corresponding degrees of responsibility.'" *Id.* at 265 (quoting *Ests. of Morgan*, 77 Ohio St. 3d at 298). "[A]bsolute control is unnecessary." *Id.* The level of control required for a § 315(a) duty is different from, for example, the almost complete control over a vulnerable person needed for a § 315(b) duty. In addition, the control required under § 315(a) must somehow address the foreseeable harm to justify imposing a duty. *See id.* at 274 (a special relationship triggers a duty to take "reasonable precautions" to protect foreseeable victims from harm).

22

The following are examples from the record of WSU's ability to control Gamma Chi to address the foreseeable dangers of its hazing:

- Imposing alcohol- and hazing-related conditions and certifications of compliance for continued recognition,

- Requiring regular meetings with CFSL advisors,

- Communicating with chapter leadership and ATO National to address chapter concerns,

- Engaging in risk-management discussions and planning,

- Requiring alcohol- and hazing-related educational programming for chapter leadership and members,

- Reporting and investigating alleged violations,

- Imposing sanctions for violations,

- Revoking recognition for violations, and

- Imposing conditions for reinstating recognition.

This list is nonexhaustive but covers some of the ways that WSU could exercise its control over fraternities to protect students from being harmed by fraternity alcohol and hazing practices.

Importantly, WSU had the ability to require fraternities to comply with rules meant to prevent the type of accident that happened here. The university uses Relationship Agreements and Approved Housing Agreements with fraternities not merely to punish violations but also to address and prevent foreseeable dangers. For example,

looking to the 2019 Sigma Nu hazing incident, WSU used the Relationship Agreement to require members to engage in educational programming, risk management, and chapter planning surrounding alcohol abuse and hazing to prevent future harms. In addition, WSU prevented the chapter from holding new member activities for a period of time to prevent foreseeable dangers. The Sigma Nu hazing incident occurred at the shared live-out with Gamma Chi, showing WSU's ability to control fraternity activity relating to new members, regardless of location.

WSU had also imposed similar requirements on Gamma Chi in the past, including mandatory reports on new member activities, certifications that events were alcohol free, and required educational programming and advising for chapter membership to address alcohol and hazing concerns. The university also met with chapter and national fraternity leadership to work on risk management planning for the chapter. And if the fraternity failed to comply, WSU could revoke recognition. University recognition and support is a powerful tool of control.

Our case law exemplifies that varying degrees of control may give rise to a § 315(a) special relationship and that the analysis is highly specific to the relationship at hand. The levels of control available to WSU here are consistent with other cases where we have imposed a § 315(a) duty.[5]

---

[5] The dissent argues that the preventative measures available to WSU to control Gamma Chi are not sufficient to establish a special relationship because some of the measures are more responsive than preventative. Dissent at 6. However, the dissent overlooks our other § 315(a) cases where control includes responsive measures that can be used to address future foreseeable harms, as discussed in text. This case is not an outlier as WSU had various means to control Gamma Chi's conduct to prevent foreseeable harms.

In *Volk*, we held a psychiatrist had sufficient control over an outpatient to give rise to the psychiatrist's duty to protect a patient's foreseeable victims.[6] *Id.* at 246. We noted outpatient psychiatrists can exercise control over their patients through preventative measures, such as

- Closely monitoring compliance with medications and the patient's mental state,

- Facilitating strong family involvement, and

- Informing a patient they may face involuntary hospitalization unless they remain compliant.

*Id.* at 265 n.12. In that same way, WSU had the ability to exercise control over Gamma Chi by

- Closely monitoring Gamma Chi's compliance with WSU's Alcohol and Drug Policies, Relationship Agreement, Approved Housing Agreement, and other relevant policies;

- Facilitating strong chapter, ATO National, and WSU involvement in addressing alcohol- and hazing-related concerns;

- Informing Gamma Chi it may face sanctions, even as severe as loss of recognition, unless it remained compliant.

---

[6] In *Volk*, we referenced "§ 315" instead of "§ 315(a)" when analyzing the special relationship between the psychiatrist and patient that gave rise to the psychiatrist's duty. However, that case is specifically about *Restatement (Second) of Torts* § 315(a). It involves a defendant's relationship with a third party and their ability to control the third party's conduct, giving rise to a duty to protect foreseeable victims. *Volk*, 187 Wn.2d 241. That case does not involve imposing a duty based on a defendant's relationship with a vulnerable or dependent victim. *Cf.* RESTATEMENT (SECOND) OF TORTS § 315(b).

Like the outpatient psychiatrist in *Volk*, WSU had "some ability to 'control'" Gamma Chi's conduct to impose a § 315(a) duty. *Id.* at 264 (quoting *Ests. of Morgan*, 77 Ohio St. 3d at 298).

*Volk* is not the only occasion where we have found that the defendant had sufficient control over a third party to impose a duty under § 315(a). We have also affirmed a § 315(a) duty in relationships between a parole officer and parolee, probation counselor and probationer, and psychiatrist and inpatient. *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992); *Hertog v. City of Seattle*, 138 Wn.2d 265, 281, 979 P.2d 400 (1999); *Petersen v. State*, 100 Wn.2d 421, 427-28, 671 P.2d 230 (1983).

For instance, in *Taggart*, we noted that a parole officer's ability to control a parolee included the ability to arrest the parolee for violating parole, preventing future foreseeable violence. 118 Wn.2d at 225. Likewise, WSU has the ability to suspend or revoke Gamma Chi's charter in response to rules violations, preventing foreseeable dangers that could arise from similar violations in the future. Like in *Taggart*, responsive measures to address past violations can serve as preventative measures to avoid future harm.

After *Taggart*, in *Hertog*, we looked to the special relationship between a probation counselor and probationer. There, we noted that although a probation counselor does not have as much control over a probationer as, for example, a parole officer who can make arrests, a counselor still has the ability to control a probationer through their

- Ability to monitor a probationer to ensure compliance with probation conditions, and

- Duty to report violations to the court.

*Hertog*, 138 Wn.2d at 279. We held that a probation counselor's control did not need to rise to the same level as a parole officer's to impose a § 315(a) duty. *Id.* WSU's control over Gamma Chi is similar to the control a probation counselor could exercise over a probationer in *Hertog*. Here, WSU had the

- Ability to monitor Gamma Chi's compliance with relevant alcohol and hazing laws and policies, and

- Authority to report violations to the Center for Community Standards board and impose sanctions for violations.

Altogether, WSU had the ability to exercise oversight to address the foreseeable dangers of Gamma Chi's freshmen hazing rituals. WSU was aware of ongoing concerns with Gamma Chi, met with Gamma Chi and ATO National leadership to discuss and monitor these issues, and could impose conditions on Gamma Chi as part of its continued recognition to address the heightened risk of harm to incoming pledges. Any failure by WSU to exercise control did not mean it lacked the ability to do so.

We hold that WSU's long-standing special relationship with Gamma Chi and its ability to control the fraternity to address the foreseeable dangers of hazing and alcohol abuse for incoming pledges, like Sam, justify imposing a § 315(a) duty.

VI

CONSIDERATIONS OF LOGIC, COMMON SENSE, JUSTICE, AND POLICY JUSTIFY IMPOSING A
DUTY ON WSU

Whether a duty exists is also guided by considerations of logic, common sense, justice, and policy. *Barlow*, 2 Wn.3d at 589. What WSU's task force documented years ago has stood true for decades—alcohol abuse and hazing poses a heightened risk of danger for undergraduate students, particularly those in fraternities. *Id.* at 600 (Montoya-Lewis, J., dissenting) ("Over the last three decades, the reality of the frequency of . . . alcohol and substance use in universities has become more understood and addressed by universities and students. Today's university experience is defined in part by these dangers." (citations omitted)).

Indeed, our legislature has long recognized the dangers of hazing by university-recognized fraternities with our antihazing laws dating back to 1993.[7] Our state's commitment to antihazing was reaffirmed in 2023 by the passage of "Sam's Law," which was passed in the wake of Sam's death. These laws demonstrate our state's deep-rooted policy against hazing. Former RCW 28B.10.900-.903 (1993); RCW 28B.10.905. When we consider our strong policy against hazing, we also consider who may be in the best position to protect foreseeable victims from these harms.

---

[7] *See* S.B. REP. on S.B. 5075, 53d Leg., Reg. Sess. (Wash. 1993) ("Hazing has been viewed as a serious social problem affecting institutions of higher education. This view is particularly strong at those institutions with fraternity and sorority living groups, which sometimes have prescribed initiation rituals required for acceptance into the organization."), https://lawfilesext.leg.wa.gov/biennium/1993-94/Pdf/Bill%20Reports/Senate/5075.SBR.pdf?q=20250822093053.

Universities have unique relationships with recognized fraternities. Fraternities rely on university recognition and support to recruit members, survive, and thrive in college communities. Loss of university recognition is usually the end of a fraternity chapter. At the same time, universities assume responsibilities over their recognized fraternities. They provide oversight, advice, and accountability. Their long-standing relationships provide universities with specialized knowledge of both the benefits that fraternities can bring to students, as well as the dangers.

Here, WSU was aware of the risk of harm that incoming pledges to fraternities faced from alcohol abuse and hazing at events like Gamma Chi's. The university received reports of, investigated, and addressed numerous incidents over the years of undergraduate students being harmed by fraternity hazing activities.

WSU was in a position to foresee harm and to take preventative measures to protect students like Sam from the dangers posed by fraternity hazing. Not only did the university help facilitate student involvement in fraternities, but it also continued to provide guidance, support, and oversight to fraternities, giving it the power to address such dangers.

In line with our state's strong policy against hazing, we hold that WSU owed a legal duty to Sam Martinez to act with reasonable care to protect him from the foreseeable harm of Gamma Chi's hazing rituals.

We hold that WSU is not immune from liability under our tort law. The university owed a duty to Sam as a matter of law.

## VII
### CONCLUSION

It should surprise no one that a house run by young men and full of other young men, many away from home for the first time in their lives, is fertile ground for abusing alcohol and engaging in dangerous initiation rituals. It was certainly no surprise to WSU.

WSU, in exchange for providing benefits to the fraternities, obtained the ability to control the fraternity's behavior. WSU prescribed rules that the fraternities had to follow in order to receive university benefits. If the fraternities broke those rules, they risked losing those benefits.

WSU's goal was to prevent its students who became members of fraternities from being harmed by alcohol misuse and by dangerous initiation rituals that amounted to hazing. This made sense. WSU was in the best position to exercise control of its fraternities in order to provide for the safety of its students.

WSU's control over its fraternities is sufficient to establish a duty of care to fraternity members. That duty included taking reasonable steps to ensure that its own rules against alcohol misuse and hazing were being followed by the fraternities. We express no opinion as to whether WSU did or did not breach that duty. This appeal only addresses the issue of whether WSU owed Sam such a duty. We hold that it did.

We accordingly affirm the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

Mungia, J.

WE CONCUR:

Stephens, C.J.

Whitener, J.

González, J.

Yu, J.P.T.

*Martinez & Houtz v. Washington State University*

No. 104108-0

MADSEN, J.[*] (dissenting)—In *Barlow v. State*, 2 Wn.3d 583, 540 P.3d 783 (2024), this court held that a special relationship between a university and its students exists when students are on campus or participating in university sponsored and controlled events pursuant to *Restatement (Second) of Torts* § 344 (A.L.I. 1965). Now, the majority holds that Washington State University (WSU) owes a duty to fraternity students to protect them from their own fraternities at their off-campus, non-university-sponsored-or-controlled events under *Restatement (Second) of Torts* § 315(a). I respectfully dissent.

DISCUSSION

Established Precedent Does Not Support Establishing a § 315(a) Duty

In *Barlow*, a student was raped by a fellow WSU student, Thomas Culhane, at a party she attended at an off-campus apartment in Pullman. 2 Wn.3d at 587. WSU had previously received two complaints of sexual misconduct against Culhane at WSU's

---

[*] Justice Barbara Madsen is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

Vancouver campus. *Id.* One complainant alleged that Culhane sent her sexual comments via electronic communication and the other alleged that he sat next to her and put his hands between her legs even after being told to stop. *Id.* at 587-88.

The Office of Student Conduct conducted a hearing and found Culhane responsible for violating student conduct. *Id.* at 588. This resulted in a suspension of nine days and a requirement that he write a paper on his understanding of consent. *Id.* While under investigation, Culhane had requested and was permitted to transfer to the Pullman campus. *Id.* Barlow filed suit against WSU in superior court, arguing in part that WSU had a special relationship with its students and that it had a duty to protect her and control Culhane given its knowledge of Culhane's past sexual misconduct. *Id.*

This court specifically rejected the argument that a special relationship and duty between a university and its students exists under § 315(a) and (b). *Id.* at 590. A university does not have protective custody or complete control over adult students, and adult students are not dependent on universities as is the case with K-12 students. *Id.* at 591.

This court rejected Barlow's argument that WSU owed her a duty under § 315(a) based on its knowledge of Culhane and its ability to control him. We rejected this argument, stating that a § 315(a) duty understandably exists in the context of a doctor-patient relationship since the doctor has insight into the dangerousness of the patient, the ability to identify possible victims, and has sufficient control over the patient. *Id.* at 593-94; *Volk v. DeMeerleer*, 187 Wn.2d 241, 264, 386 P.3d 254 (2016). We stated that such

2

a relationship does not exist between a university and its students since interactions are less intimate and consistent; the university did not have sufficient insight into the potential dangerousness of Culhane, could not identify Barlow as a potential victim, and could not exercise sufficient control over Culhane. *Barlow*, 2 Wn.3d at 594.

We cited cases in other states that found that the university has a special relationship with its students and has the responsibility to take reasonable measures to protect them from alcohol-related emergencies *only* when the university has actual knowledge of conditions that would lead them to conclude a student *on campus* is in imminent danger of physical harm due to alcohol intoxication and the student is incapable of seeking help. *Id*. at 595; *Helfman v. Ne. Univ.*, 485 Mass. 308, 321, 149 N.E.3d 758 (2020). Similarly, California recognized a duty relating only to activities that the university sponsors or facilities that it controls. *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 625-27, 413 P.3d 656, 230 Cal. Rptr. 3d 415 (2018).

We clarified that a special relationship between a university and its students exists under *Restatement* § 344. Section 344 provides an exception to the general rule that there is no duty to protect others. It provides that "[a] possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose." RESTATEMENT (SECOND) OF TORTS § 344. Therefore, "[u]nder this rule, a university, as a business operator and possessor of land, owes a duty and would potentially be liable to members of the public, including students, who are on campus for school related purposes." *Barlow*, 2 Wn.3d at

3

590. The duty is limited to "university property and activities controlled by the university." *Id*.

Notably, we rejected Barlow's argument that because a university's code of conduct addresses off-campus behavior, the university controls student behavior, and thus a duty should extend off campus. *Id*. at 597. We stated that "[t]he code of conduct does not create control of students' behavior in a preventative way. The code may provide the university the ability to academically punish students after the fact, with suspensions, academic probation, or even expulsion. The code of conduct is irrelevant to establishment of a duty." *Id*. Moreover, "a university simply has no power to dictate students' movements off campus and away from the oversight of campus security and administration." *Id*. We ultimately limited the duty to when students are either on campus or participating in university controlled activities. *Id*. We declined to extend the duty to "off-campus, non-school-sponsored interactions," which are under a student's, not the university's, control. *Id*.

WSU Does Not Have Sufficient Control over Gamma Chi To Establish a § 315(a) Duty

About a quarter of WSU's undergraduate population are members of Greek organizations recognized by WSU. In 2019, WSU recognized over 60 Greek organizations. Gamma Chi, an unincorporated association, was the Pullman chapter of Alpha Tau Omega Fraternity Inc. (ATO National), a nonprofit organization. Through its "Chapter Minimum Guidelines of Operations", ATO National controls, among other

4

things, Gamma Chi's organization, membership rituals, new member training, and safety. University recognition is not required for a fraternity to exist; however, recognition allows WSU to *discipline* Gamma Chi *after* it commits violations of the "Relationship Agreement for Residential Fraternities & Sororities" (Relationship Agreement) and the "University Approved Housing Standards Agreement" (Approved Housing Agreement).

To find a § 315(a) duty, there must be an ability to control. Notably, there is a comment in reference to § 315(a), which states that "[t]he relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319." *See* § 315 cmt. c. Those sections involve the duty of a parent to control his minor child, the duty of a master to control his servant, the duty of a possessor of land or chattels to control the conduct of a licensee, and the duty of one who takes charge of a third person with dangerous propensities to take reasonable care to control the third person to prevent harm. *See* RESTATEMENT (SECOND) OF TORTS §§ 316-319. These are examples where a special relationship and ability to control exists.

The examples above are not comparable to the relationship between a university and a fraternity, especially with regard to conduct occurring by fraternity students outside of a university's control. As stated in *Barlow*, the relationship between a university and its students is far less intimate than that of a psychiatrist and patient. 2 Wn.3d at 594. Despite *Barlow*, which held that WSU owed no duty to protect third parties from the off-campus conduct of its student, the majority now holds otherwise. The result is illogical:

5

the majority holds that WSU owes a duty to protect Gamma Chi members from Gamma Chi itself, an organization that can act only through those very members.

The majority lists multiple examples of ways that WSU may control Gamma Chi; however, many of the measures listed are often *in response* to violations. The preventative measures listed are minimal, including regular meetings with the Center for Fraternities and Sororities Life (CFSL), communicating with chapter leadership and ATO National to discuss risk management. This is not a level of control rising to establish a § 315(a) duty. The majority also uses the Sigma Nu hazing event as an example of control; however, the actions WSU took, such as requiring educational programming, risk management, and preventing the chapter from holding new member activities, was in response to a violation of their agreements. The majority conflates WSU's ability to discipline fraternities for their off-campus conduct with control over their off-campus conduct.

As we stated in *Barlow*, the existence of a code of conduct that provides disciplinary measures does not establish control. It is not preventative control; it is the imposition of consequences after finding a violation of the rules. *See Volk*, 187 Wn.2d at 265 (focusing on the number of preventative measures mental health professionals can take in the outpatient setting to establish a duty). The few preventative measures here include the requirement of a live-in advisor at the chapter house, issuance of warnings, and meetings with CFSL. Most of the control WSU has over Gamma Chi is sanctions including probation, suspension, educational programming, and revocation of recognition

in response to violations of the Relationship Agreement, Approved Housing Agreement,

and the "Standards of Conduct for Students" (SCS). These are not examples of

preventative measures, but, rather, they are in response to violations. This is not much

different from the sort of control the university has over any student who violates the

SCS. Just like WSU can discipline Gamma Chi for its members' off-campus conduct

that violates the Relationship Agreement or Approved Housing Agreement, it may also

discipline a student for violating the SCS even if the conduct occurred off campus.

Furthermore, the Relationship Agreement outlined the relationship between

Gamma Chi and WSU. It explicitly stated that WSU does not control, supervise, or

direct chapter activities. They acknowledged that they are two separate and distinct

entities. WSU does not control the organizational structure, rituals, or off-campus

activities of Gamma Chi. The provisions within the Relationship Agreement and

Approved Housing Agreement primarily request that Gamma Chi comply with state law

and university policy that prohibits hazing and consumption of alcohol. This does not

equate to direct oversight or control over the behavior of Gamma Chi members off

campus. "Regulatory control over a third party is not sufficient to establish the necessary

control which can give rise to an actionable duty." *Honcoop v. State*, 111 Wn.2d 182,

193, 759 P.2d 1188 (1988). It is ATO National that can exercise the most preventative

control over Gamma Chi. It did so in 2018 when it conducted a membership review and

voluntary drug testing after hearing concerns about Gamma Chi. This resulted in 38

members of Gamma Chi being expelled from the fraternity. Furthermore, Richmond

7

Property Group, which owned, managed, and leased the Gamma Chi house employed the live-in advisor at the chapter house and was in the best position to monitor Gamma Chi. Moreover, Gamma Chi members are not inclined to inform WSU of Relationship Agreement or Approved Housing Agreement violations for fear of being disciplined or for fear of being ostracized by fellow members.

The majority also states that WSU knew of the dangers of the live-out house and had sufficient control over conduct occurring at live-out houses. Yet the live-out house is neither owned nor operated by WSU. It did not have the authority to prohibit students from going to the live-out house. The Relationship Agreement and Approved Housing Agreement does not cover live-out houses, in fact, it explicitly excludes them. Just as WSU can discipline Gamma Chi for its members engaging in underage alcohol consumption at the live-out house, it may also discipline any student regardless of their membership in a fraternity and regardless of location. The majority attempts to distinguish *Barlow*; however, *Barlow* made clear that WSU owes a duty for activities occurring on its campus or activities that are sponsored or controlled by the university. Off-campus parties at a live-out house are not university sponsored or controlled events. Nor does the relationship between WSU and Gamma Chi rise to the level of a special relationship under § 315(a) for reasons explained below.

WSU Does Not Have a § 315(a) Special Relationship with Gamma Chi

The majority holds that there is a special relationship between the fraternity here and WSU. By finding a special relationship with Gamma Chi, the majority is finding that

8

WSU has a special relationship with over 60 Greek organizations and essentially a quarter of WSU's students, just by nature of their joining a Greek organization recognized by the University. To determine whether WSU owed a duty to persons injured by the fraternity under § 315(a), we must analyze whether "a definite, established, and continuing relationship" existed between WSU and Gamma Chi, and whether it had control over Gamma Chi's conduct. *Volk*, 187 Wn.2d at 256, 264.

To create a special relationship, there must be something more than the existence of policies preventing a certain kind of harm. *See Bradshaw v. Rawlings*, 612 F.2d 135, 141 (3d Cir. 1979) (college policies prohibiting the consumption of alcohol at off-campus, college-sponsored events were not sufficient to place the college in a custodial relationship with its students for purposes of imposing a duty to protect students attending the event).

What commonly makes a relationship "special" under § 315(a) is that one party has responsibility for, authority over, or the ability to control the other, such as in relationships between a parent and child, employer and employee, or therapist and dangerous patient. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §§ 316-319.[1] There must be the ability to control the third party and know of their dangerous propensities. *R.K. v. U.S. Bowling Cong.*, 27 Wn. App. 2d 187, 198, 531 P.3d 901 (2023).

---

[1] I recognize that §§ 316-319 contemplate varying degrees of control, and that the level of control required under those sections does not necessarily correspond to the level of control required to establish a special relationship under § 315(a). As the majority notes, for example, the level of control contemplated by § 319 is not necessary to establish a special relationship under § 315. Majority at 18 n.4. Nevertheless, these sections are instructive because each involves a degree of control greater than that present here. They therefore provide useful points of comparison in assessing whether the relationship in this case is sufficiently special to give rise to a duty under § 315(a).

Our case law supports finding a special relationship under § 315 if there is an intimate relationship between an actor and a third person in which the actor has sufficient control over the person and knows of their dangerous propensities. For example, we have recognized the duty of a psychiatrist to protect against foreseeable injuries caused by his or her patient. *See Petersen v. State*, 100 Wn.2d 421, 428-29, 671 P.2d 230 (1983); *Volk*, 187 Wn.2d at 274 (recognizing a duty owed by the psychiatrist in the outpatient setting). We have recognized a special relationship between parole officers and their parolees. *See Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992). We have also recognized a special relationship between a probation officer and probationer. *See Bishop v. Miche*, 137 Wn.2d 518, 525, 973 P.2d 465 (1999). These are all more intimate relationships, unlike the one we have here.

Although WSU's relationship with Gamma Chi dates back to 1911, its relationship is contractual and of a business nature. The relationship here lacks the characteristics typical of a special relationship, which is typically an intimate one-on-one relationship between two individuals. Gamma Chi does not have such an intimate relationship with WSU—one that is akin to a patient with their psychiatrist or a parolee with their parole officer. The nature of their relationship is a contractual one that defines the boundaries of their relationship and confers mutual benefits to one another. Gamma Chi receives benefits through WSU recognition, especially monetary, but it may exist and operate with or without recognition. The relationship between WSU and Gamma Chi is more

accurately described as a contractual business relationship as opposed to a special

relationship under § 315(a).

      With these considerations in mind, I respectfully dissent.

_____
Madsen, J.P.T.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Staab, J.P.T.